AO 91 (Rev. 11/11)  Criminal Complaint

FILED
CLERK, U.S. DISTRICT COURT

DEC 19 2018

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## for the
Central District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Byungsu Kim, | ) | Case No.  18 MJ 3349 |
| Youngin Back, and | ) | |
| Bong Jun Kim | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____October 29, 2018_____ in the county of _____Los Angeles_____ in the
_____Central_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 16 U.S.C. 3372(a)(2)(B), (a)(4) | Illegally attempting to export plants to a foreign country in violation of state law or regulation |

This criminal complaint is based on these facts:

On or about October 29, 2018, defendants Byungsu Kim, Youngin Back, and Bong Jun Kim did knowingly attempt to export plants taken, possessed, transported or sold in violation of a state law or regulation that protects plants, namely, California Code of Regulations § 4306(a) and/or California Penal Code § 384a(a), when they attempted to export to Korea plants that they had illegally harvested from public lands in California.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Laura Chee, USFWS Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __12/19/18__

_____
*Judge's signature*

City and state: _____Los Angeles, California_____    U.S. Magistrate Judge Michael R. Wilner
*Printed name and title*

## AFFIDAVIT

I, Laura Chee, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against and arrest warrants for BYUNGSU KIM ("KIM"), YOUNGIN BACK ("BACK"), and BONG JUN KIM ("BONG JUN KIM") for a violation of 16 U.S.C. §§ 3372(a)(2)(B), (a)(4) (illegally attempting to export plants to a foreign country in violation of a state law or regulation, namely, California Code of Regulations § 4306(a) and/or California Penal Code § 384a(a)).

2.   This affidavit is also made in support of an application for a warrant to search the three digital devices (the "SUBJECT DEVICES") seized from KIM and BONG JUN KIM on or about October 29, 2018 by the California Department of Fish and Wildlife.  The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitute evidence or fruits of violations of 16 U.S.C. §§ 3372(a)(2)(B), (a)(4) (illegally attempting to export plants to a foreign country in violation of state law), 16 U.S.C. § 3372(d)(2) (making or submitting false records regarding plants transported in interstate or foreign commerce), 18 U.S.C. § 554 (smuggling goods from the United States), and 18 U.S.C. § 371 (conspiracy) (the "Subject Offenses"), and any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

1

3.    The SUBJECT DEVICES are identified in Attachment A to the search warrant application.  The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF SPECIAL AGENT CHEE</u>

5.    I am a Special Agent ("SA") with the Department of the Interior, United States Fish and Wildlife Service ("USFWS"), Office of Law Enforcement, stationed in Torrance, California.  I am an investigative law enforcement officer of the United States within the meaning of Title 16, United States Code, Section 3375, and a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure.  I have been so employed since August 2002.

6.    As a SA, I have read, studied, and received training on various laws enforced by the USFWS.  During my employment with the USFWS, I have conducted and participated in investigations of violations of federal wildlife and plant law. These inquiries have included investigations of the illegal

domestic and international trade of wildlife and plants, including those used in the commercial plant trade.

### III. **STATUTORY FRAMEWORK**

7.    Title 16, United States Code, Section 3372(a)(2)(B)(i) provides, <u>inter alia</u>, that it is unlawful for any person to export, transport or acquire, in interstate or foreign commerce, any plant taken, transported or sold in violation of any state law or regulation that protects plants or that regulates the taking of plants from a park, or the taking of plants without, or contrary to, required authorization.  Title 16, United States Code, Section 3372(a)(4) provides, <u>inter alia</u>, that it is unlawful for any person to attempt to commit any act described in Section 3372(a)(2)(B)(i).

8.    Title 14, California Code of Regulations, Section 4306(a), states as follows:

> No person shall willfully or negligently pick, dig up, cut, mutilate, destroy, injure, disturb, move, molest, burn, or carry away any tree or plant or portion thereof . . . except in specific units when authorization by the Department . . . is posted at the headquarters of the unit to which the authorization applies. Any collecting allowed by authority of this section may be done for personal use only and not for commercial purposes.

9.    Section 384a(a)(2) of the California Penal Code prohibits any person from willfully or negligently cutting or removing plant material that is growing upon public land without a written permit.  Section 384a(a)(3) prohibits any person from knowingly selling, or offering or transporting for sale, plant material that is cut or removed in violation of Section 384a(a).

### IV. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  In October 2018, KIM, BACK, and BONG JUN KIM arrived in Los Angeles from their native Korea and drove to remote coastal areas in Northern California.  As they later admitted, their goal was to secretly remove live <u>Dudleya</u> plants from the ground and ship the plants to Korea, where the plants are prized commodities.  From October 14 to October 25, 2018, wardens from the California Department of Fish and Wildlife ("CDFW") surveilled KIM, BACK, and BONG JUN KIM removing <u>Dudleya</u> plants from public lands along the coast of Northern California.  KIM, BACK, and BONG JUN KIM then drove with the plants to a nursery near San Diego.  On October 29, 2018, KIM, BACK, and BONG JUN KIM brought <u>Dudleya</u> plants to an exporter in Compton, where they attempted to ship the plants to Korea.

### V. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  Based on my review of reports from the USFWS and CDFW regarding the events described below, my conversations with USFWS agents and CDFW wardens, and my own observations and knowledge of the investigation, I have learned the following:

**A.  KIM's Arrival in the United States on October 4, 2018**

12.  In or about September 2018, CDFW Special Operations Unit ("SOU") Warden Savannah Morgan notified me that she suspected that KIM was involved with exporting large amounts of <u>Dudleya</u> plants from the United States to Korea.

13.  <u>Dudleya</u> plants are highly valuable in Asian markets. Native <u>Dudleya</u> plants from coastal habitats in Northern California are particularly valuable, as they are difficult to

4

propagate in nurseries because of their slow growth rates.  For this reason, smugglers are known to harvest wild, living <u>Dudleya</u> plants from the ground in Northern California and export the live plants to Asian markets.

14.  On or about September 11, 2018, I spoke with United States Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent Binh Dang and requested a "lookout" for KIM.  From my experience, I know that a lookout will notify the requesting officer when the targeted subject is travelling inbound into the United States from another country.

15.  On or about October 4, 2018, I was notified by U.S. Customs and Border Protection ("CBP") Officer Alan Galdamez that KIM had arrived at Los Angeles International Airport ("LAX") from Korea with another individual named Youngin BACK.  I asked Officer Galdamez to question KIM about his purpose of travel and to obtain copies of anything related to plants.  Officer Galdamez told me that KIM said that he was going to Mexico and would return in a couple of weeks.  At the time, KIM had not made a return reservation.

16.  On or about October 26, 2018, I received the paperwork obtained by Officer Galdamez during the interview of KIM on or about October 4, 2018.  From my review of the paperwork, I learned the following:

a.   The paperwork included an invoice for the purchase of plants.  Near the top of one of the documents, it stated "New order: Neo/Saman-S.Korea," for delivery in early

5

2019 only, and listed numerous plant species, amounts, prices, and totals.

      b.   There was one United States Department of Agriculture ("USDA") Phytosanitary Certificate ("Phyto"), No. F-C-06073-07695410-7-N, issued from San Diego and inspected on or about September 12, 2018, for the Secret Garden Nursery in Vista, California.[1]  From inspecting the USDA Phyto, I learned the following:

      i.   The USDA Phyto identified the name and address of the exporter as the Secret Garden Nursery, located at 1850 Warmlands Avenue in Vista.

      ii.   The declared name and address of the consignee was Saman Trading, 5F 63, Banghwadaero 33-gill, Kangseo-gu, Seoul 157-811, Republic of Korea.

      iii. The declared name and quantity of the produce was 5,731 plants (501 pounds) of <u>Dudleya</u> cuttings in approximately 101 cardboard boxes.

      iv.  The place of origin was San Diego County.

      v.   The declared means of conveyance was air freight.

---

[1] On or about October 5, 2018, I spoke with USDA Inspector Aaron Nishimoto, who told me that USDA Inspectors issue Phytosanitary Certificates ("Phytos") and allow County Agriculture Inspectors to issue USDA Phytos.  I know through my experience that USDA Phytos are issued for agricultural items being exported to other countries.  USDA Phytos certify that the items have been inspected and are free from the quarantine pests specified by the importing country.  Additionally, from my experience, I know that some importing countries require USDA Phytos upon entry into their country.

            vi.   The USDA Phyto was issued on or about September 12, 2018 by the authorized officer Saiqa F. Javed.

17.   Officer Galdamez later told me that KIM had declared approximately $20,000 and that KIM had told Officer Galdamez that he was going to Mexico to purchase plants and export them to the United States and then to Korea and China.   Officer Galdamez also told me that when he was conducting the inspection of KIM, he observed paperwork with a nursery name and recalled that KIM had told him that the nursery assisted him with importing plants into the United States from Mexico.

**B.   KIM's History of Travel to the United States**

18.   On or about October 10, 2018, I met with CBP Officer Jose Monroy in the Passenger Analysis Unit ("PAU") at LAX. Officer Monroy told me that KIM would be arriving at LAX from Mexico on or about October 11, 2018.   I provided this information to Warden Morgan.   Based on Officer Monroy's preliminary research on KIM, I learned that KIM had travelled to the United States from Korea more than 50 times since 2009 and more than 30 times since 2013.   I also learned the following information:

            a.   On or about February 19, 2013, KIM had 80 pieces of propagative/plant material upon entry into the United States that was seized by the CBP.   KIM declared the plants and also brought "bogus" USDA Phytos with him to enter the plants into the United States.

b.   On or about March 29, 2013, KIM told the CBP that he was in the United States to conduct cactus business for one week.

c.   On or about April 27, 2013, KIM told the CBP that he was a florist and importer of goods from Mexico into Korea. KIM had approximately $16,232 that he did not declare at the time of entry into the United States, for which he paid a penalty.

d.   On or about August 16, 2013, KIM told the CBP that he was in the United States to visit a nursery and that he owned Baek Woon Nong Won nursery in Korea.  He told the CBP that he planned to stay in the United States for two weeks.

e.   On or about July 27, 2015, KIM self-referred himself to complete a FINCEN report[2] and entered the United States with approximately $13,500.

f.   On or about March 14, 2017, KIM was inbound from Mexico and told the CBP that he purchased flowers in Mexico which were shipped to Korea.  At the time, KIM also had a pair of gloves that had soil on it.

g.   On or about April 4, 2017, KIM self-referred himself to complete a FINCEN report and entered the United States with approximately $30,000.

---

[2] Based on my training and experience, I know that the Financial Crimes Enforcement Network ("FINCEN") is a bureau of the United States Department of the Treasury that collects and analyzes information about financial transactions in order to combat domestic and international money laundering and other financial crimes.

**C.    Surveillance of KIM, BACK, and BONG JUN KIM**

19.    Based on my conversations with Warden Morgan and my
review of her written reports, I learned that, on or about
October 11, 2018, the CDFW SOU team began conducting
surveillance of KIM upon his arrival at LAX from Mexico.  During
their surveillance, the wardens saw or learned the following:

        a.    On or about October 11, 2018, KIM, along with
BACK, rented a Dodge Caravan at Alamo Rent-A-Car and drove to a
location in Vista, California (later identified as the Secret
Garden Nursery at 1850 Warmlands Avenue).

        b.    On or about October 12, 2018, the wardens saw
that the Dodge Caravan contained rubber totes, empty backpacks,
and boxes.

        c.    On or about October 12, 2018, KIM and BACK picked
up an individual (later identified as BONG JUN KIM) at LAX.
After meeting with BONG JUN KIM, KIM rented a White Kia at Avis
Rent-A-Car.  The two vehicles and three individuals drove north
to stay at a hotel that evening.

        d.    On or about October 13, 2018, KIM, BACK, and BONG
JUN KIM stayed at a hotel in Crescent City overnight.

        e.    On or about October 14, 2018, KIM, BACK, and BONG
JUN KIM harvested numerous plants at DeMartin State Beach in
Klamath, California and Del Norte Coast Redwoods State Park.

        f.    KIM, BACK, and BONG JUN KIM appeared to the
wardens to be attempting to conceal their harvesting, due to
their tendency to hide from public view.  The wardens saw KIM,

BACK, and BONG JUN KIM placing Dudleya plants into their
backpacks.

g.   On or about October 15, 2018, KIM, BACK, and BONG
JUN KIM parked at DeMartin State Beach, where a National Park
Service ("NPS") vehicle also was parked.  KIM, BACK, and BONG
JUN KIM parked, got out, returned to their vehicle shortly
thereafter, and parked again.  Once KIM, BACK, and BONG JUN KIM
saw the NPS vehicle leave, they got out of their car and
proceeded to collect more plants.  A large pile of freshly
collected Dudleya plants grew as the day progressed.

h.   On or about October 16, 2018, KIM, BACK, and BONG
JUN KIM arrived at the DeMartin State Beach again, wearing
backpacks.  They harvested additional plants, which they
collected in piles.

20.  Based on the wardens' surveillance and information
from a GPS tracker, KIM, BACK, and BONG JUN KIM travelled to
DeMartin State Beach on or about October 17, 18, 19, and 20,
2018.

21.  On or about October 22, 2018, the wardens followed
KIM, BACK, and BONG JUN KIM from Northern California south to
the Secret Gardens Nursery in Vista.  The wardens saw totes
being emptied of Dudleya plants and saw Dudleya plants on
pallets.

22.  On or about October 23, 2018, the wardens followed
KIM, BACK, and BONG JUN KIM from Southern California north to
Sonoma County.

23.   On or about October 24, 2018, the wardens saw KIM,
BACK, and BONG JUN KIM go to Russian Gulch State Park in
Mendocino County wearing backpacks, and watched them harvest
Dudleya plants.  The wardens also saw them using hand-held
radios to communicate.  KIM, BACK, and BONG JUN KIM appeared to
have full backpacks at the end of their visit.

24.   On or about October 25, 2018, the wardens saw KIM,
BACK, and BONG JUN KIM return to Russian Gulch State Park with
empty backpacks and return to an area where the wardens had
watched them harvest Dudleya plants the previous day.  The
wardens saw them walking towards the parking lot with large and
bulky backpacks.

25.   On or about October 25, 2018, the wardens saw KIM,
BACK, and BONG JUN KIM return to their vehicle and drive to
Vista for the evening.  The next day, the wardens saw KIM, BACK,
and BONG JUN KIM drive to the Secret Gardens Nursery in Vista.
A warden observed them unload items from their vehicle and walk
toward the greenhouse out of view.

**D.    USDA Phytosanitary Certificate Information for the
        Secret Garden Nursery**

26.   On or about October 22, 2018, I spoke with Supervisor
Agriculture Inspector Robert Roma and Inspector Saiqa Javed from
the County of San Diego's Agriculture, Weights and Measures
department ("County Agriculture").  Inspector Javid's name was
listed in the USDA Phyto, dated September 12, 2018, identified
during KIM's interview at LAX on or about October 4, 2018 by CBP

11

Officer Galdamez.  Based on our conversation, I learned the following:

        a.   County Agriculture issues USDA Phytos for licensed nurseries.  In 2017 and 2018, County Agriculture issued approximately 22 USDA Phytos to the Secret Garden Nursery.

        b.   Applications for USDA Phytos are entered into the Phytosanitary Certificate Issuance Tracking ("PCIT") database and then an appointment for an inspection is made.

        c.   The Secret Garden Nursery had two locations:  one at 14643 Vesper Road in Valley Center, California and one at 1850 Warmlands Avenue in Vista.

        d.   An individual known as "Neo" (later confirmed to be KIM) typically was the person who attended the inspections on behalf of the Secret Garden Nursery.  "Neo" always paid in cash. Inspector Javid did not know much more about "Neo" because "Neo" primarily spoke Korean.  Inspector Javid was primarily in contact with E.S., the owner of record for the Secret Garden Nursery.

        **E.**    **CBP Export Records for the Secret Garden Nursery**

    27.  On or about October 23, 2018, I met with CBP Officer Lionel Andrade at CBP's International Mail Facility in Carson. I learned that the Secret Garden Nursery sent multiple shipments (from both of its locations) to Max Cargo (a forwarding agent located at 1250 West Artesia Boulevard in Compton) to Saman Trading in Seoul, Korea, the ultimate consignee.

    28.  After meeting with Officer Andrade, I compared the USDA Phytos and the dates of KIM's flights and the exports for

the Secret Garden Nursery.  I learned that there were at least three USDA Phytos for the Secret Garden Nursery with the same or similar dates of export from Max Cargo within time frames that KIM travelled:

| DATE OF ISSUE OF USDA PHYTO | DATE OF MAX CARGO'S SHIPMENT TO KOREA | DATES OF KIM'S STAYS IN THE UNITED STATES |
|---|---|---|
| 9/12/2018 | 9/12/2018 | 8/28/18 - 9/13/18 |
| 7/20/2018 | 7/20/2018 | 7/11/18 - 7/23/18 |
| 6/8/2018 | 6/8/2018 | 5/15/18 - 6/11/18 |

**F.  Surveillance of KIM, BACK, and BONG JUN KIM on October 29, 2018**

29.  On or about October 26, 2018, I spoke with San Diego County Agriculture employee Charity (LNU), who told me that "Neo" had just came into her office to make an inspection appointment for Monday, October 29, 2018 at 8:30 a.m. and had requested assistance with preparing a new license with County Agriculture.

30.  On or about October 29, 2018, CDFW wardens, SA Dang, and I conducted surveillance of KIM, BACK, and BONG JUN KIM.  I learned the following, either through my own observations or my review of Warden Morgan's report:

a.  At approximately 7:45 a.m. on or about October 29, 2018, KIM left his hotel and went to the County Agriculture office, apparently to obtain help completing the USDA Phyto paperwork.  He then returned to the hotel.

b.  At approximately 8:20 a.m., KIM, BACK, and BONG JUN KIM left their hotel and drove to the Secret Garden Nursery in Vista.

13

c.   At approximately 9:23 a.m., the County
Agriculture inspector arrived at the Secret Garden Nursery in
Vista and conducted the inspection relating to the USDA Phyto.

31.   On or about October 29, 2018, Supervisor Roma provided
me with a copy of the USDA Phyto that was prepared for KIM's
shipment that day.   I reviewed the document and learned the
following:

a.   The USDA Phyto identified the name and address of
the exporter as the Secret Garden Nursery, located at 1850
Warmlands Avenue in Vista.

b.   The declared name and address of the consignee
was Saman Trading, 5F 63, Banghwadaero 33-gill, Kangseo-gu,
Seoul 157-811, Republic of Korea.

c.   The name and quantity of the produce declared was
1,397 plants (259 pounds) of Dudleya cuttings in 37 cardboard
boxes.

d.   The place of origin was San Diego County.

e.   The declared means of conveyance was air freight.

f.   The USDA Phyto was issued on or about October 29,
2018 by the authorized officer, Saiqa F. Javed.

**G.   Interviews of KIM, BACK, and BONG JUN KIM on October
29, 2018**

32.   On or about October 29, 2018, after the inspection
described above, my team and I continued our surveillance of
KIM, BACK, and BONG JUN KIM as they drove to Max Cargo at 1250
West Artesia Boulevard in Compton.

14

33.   Based on a report prepared by Warden Morgan, I learned the following:

a.   The wardens saw the vehicle with KIM, BACK, and BONG JUN KIM inside it back into a loading ramp beside a large roll-up door at Max Cargo.  KIM, BACK, and BONG JUN KIM unloaded boxes of what appeared to be Dudleya plants from their vehicle.

b.   Pursuant to a state search warrant that Warden Morgan had obtained, she examined a few of the boxes that were offloaded by KIM, BACK, and BONG JUN KIM.  She learned that the boxes contained Dudleya plants and were labeled "Rush" and "Live Plants."

c.   Pursuant to the search warrant, the wardens seized approximately 3,715 Dudleya plants (664 pounds) in 34 boxes at Max Cargo.

d.   After KIM, BACK, and BONG JUN KIM delivered the plants to Max Cargo and left (i.e., just prior to the execution of the search warrant), the wardens stopped their vehicle and asked them to get out.

e.   After they were stopped, I conducted recorded interviews of all three individuals, with the assistance of Warden Morgan, SA Dang, and HSI SA Sam Ahn.  SA Ahn translated between English and Korean during the interviews.

34.  During his Mirandized interview, BACK said the following:

a.   BACK travelled to the United States with his friend KIM to sightsee and visit nurseries.  KIM paid for BACK's

15

airplane ticket and hotel fees.  BACK came to the United States
as KIM's employee.

  b.   BACK and KIM went to different areas to collect
plants from the wild.  BACK knew that they were going to collect
the plants and that the plants would be sent to Korea.  BACK and
KIM planned to collect the plants and bring them to Max Cargo,
and then possibly go to KIM's nursery in Korea.

  c.   BACK knew that it was illegal to collect the
plants because KIM had told him.  KIM had collected plants in
the United States previously.

  35.   During his <u>Mirandized</u> interview, BONG JUN KIM said the
following:

  a.   KIM had two nurseries, one in Korea and one in
California.

  b.   On or about October 9, 2018, KIM called him and
asked him to assist with his nursery.  KIM was going to pay him
$1,700 to assist with his nursery.  KIM paid for his airplane
ticket and hotel fees.

  c.   On or about October 11, 2018, BONG JUN KIM
arrived in the United States, where he began collecting plants.
KIM told him that it was illegal to collect the plants.  They
used radios to communicate if someone approached them while they
were collecting plants.

  **H.   Arrests of KIM, BACK, and BONG JUN KIM and Seizure of
        Their Phones on October 29, 2018**

  36.   Based on my conversations with Warden Morgan, my
review of her reports and the arrest warrants issued to her on

or about October 29, 2018 in Los Angeles County Superior Court,
and information provided to me by the Del Norte County Superior
Court on or about December 6, 2018, I learned the following:

      a.   CDFW wardens arrested and booked KIM, BACK, and
BONG JUN KIM on or about October 29, 2018 following the
interviews described above.  They each were arrested for
violations of California Penal Code §§ 182(a)(1) (conspiracy)
and 384(a)(2) (willful or negligent cutting, destroying,
mutilation, or removal of plant material that is growing upon
public land).  They are currently being prosecuted in the Del
Norte County Superior Court in Case Nos. CRS2018-9581/1 (BONG
JUN KIM), CRS2018-9581/2 (KIM), and CRS2018-9581/3 (BACK).

      b.   Pursuant to a state search warrant issued to
Warden Morgan on or about October 26, 2017 in Los Angeles County
Superior Court, she seized the following three phones belonging
to KIM and BONG JUN KIM at the time of their arrests on or about
October 29, 2018:

      i.   An Apple iPhone, model A1660, serial
number F71SQURZHG75, belonging to KIM;

      ii.   An Apple iPhone, model MQAF2AA/A, serial
number DNPVVVZ9JCL8, belonging to KIM; and

      iii. A Samsung Model SM-G930S, serial
number R39H606R91, belonging to BONG JUN KIM.

      c.   The wardens and their local law enforcement
colleagues have begun to search the SUBJECT DEVICES pursuant to
the state warrant.  I have not relied on their findings to
articulate probable cause in this affidavit.  I am seeking a

17

federal search warrant for the SUBJECT DEVICES prior to
independently investigating the contents of the SUBJECT DEVICES.

d.   As of November 26, 2018, KIM, BACK, and BONG JUN
KIM were all released on bail awaiting their next hearings in
Del Norte County.

e.   On or about December 14, 2018, I received the
SUBJECT DEVICES from CDFW in West Sacramento, California.   The
SUBJECT DEVICES are now in the custody of USFWS in Torrance,
California.

**I.   Analysis of the Seized _Dudleya_ Plants**

37.   On or about December 11, 2018, I reviewed findings
prepared by Stephen McCabe, a Research Consultant for the
University California of Santa Cruz, regarding his analysis of
the 34 boxes of _Dudleya_ plants that were seized from Max Cargo
on or about October 29, 2018.   McCabe concluded as follows:

a.   The _Dudleya_ plants that McCabe evaluated appeared
to be collected from the wild, as opposed to cultivated, based
on a number of factors including their size, number, apparent
age, type of damage to the roots, type of soil on the roots,
incomplete removal of leaves from the stems, debris on the
leaves, and the appearance of the leaves.   The plants' roots
showed no signs of the morphology one would expect of container-
grown plants.

b.   After review of the 34 boxes of _Dudleya_ plants,
McCabe identified that the plants in approximately 24 of the
boxes appeared to be _Dudleya farinosa_.   McCabe surmised that

those plants most likely were from Del Norte County (as opposed to Russian Gulch).

      c.   Nine of the other boxes appeared to contain a mix of Dudleya plants.  The white ones were very likely to be Dudleya farinosa.  The green ones were either the non-waxy form of Dudleya farinosa, Dudleya caespitosa, or Dudleya farinosa X Dudleya caespitosa, but most likely were Dudleya caespitosa. McCabe surmised that these plants most likely were from Russian Gulch (as opposed to Del Norte County).

    38.  Warden Morgan conducted a valuation of the Dudleya plants seized at Max Cargo on or about October 31, 2018.  Based on the prices listed on a Korean website (http://en.explant.co.kr) for Dudleya farinosa, she concluded that the value of the seized plants in Korea would be approximately $602,950.

    **J.    KIM, BACK, and BONG JUN KIM's Lack of a Permit to Harvest or Export Dudleya Plants**

    39.  On or about November 29 and 30, 2018, I spoke with Catherine Caldwell of the California State Parks' Natural Resources Division, to verify whether KIM, BACK and/or BONG JUN KIM had permits to collect plants in the associated districts of Del Norte State Park, Russian Gulch State Park, or other districts.  Over the following week, I received confirmation from three Senior Environmental Scientists at the Natural Resources Division that no scientific permits had been issued to KIM, BACK and/or BONG JUN KIM.

40.   On or about December 12, 2018, Aaron Nishimoto, a
Certification Specialist for United States Department of
Agriculture, conducted a search and did not find any federal
permits for KIM, BACK, and BONG JUN KIM to remove native plants.

VI. **TRAINING AND EXPERIENCE IN TRAFFICKING OF PLANTS AND WILDLIFE**

41.   Based on my training and experience, and information
provided to me by other experienced SAs, I have learned that
international trafficking of wildlife and plants is often
facilitated using e-mail and/or text messages.  Individuals who
traffic in contraband wildlife and plants frequently correspond
by phone, email, text message, and social media with their
associates, suppliers, and customers.  This includes sending
photographs of the wildlife and plants and negotiating the
prices and timing of transactions.  These individuals also
maintain telephone numbers, email addresses, and other contact
information for their co-conspirators on their digital devices.
Accordingly, there is probable cause to believe that digital
evidence related to the trafficking of plants in this case will
be found on the SUBJECT DEVICES.

VII. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

42.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony

20

PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

     43.  Based on my knowledge, training, and experience, as
well as information related to me by agents and others involved
in the forensic examination of digital devices, I know that it
is not always possible to search digital devices for digital
data in a single day or even over several weeks for a number of
reasons, including the following:

          a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software programs in use today that it takes time to
conduct a thorough search.  In addition, it may be necessary to
consult with specially trained personnel who have specific
expertise in the type of digital device, operating system, and
software application being searched.

          b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the
integrity of digital data and to recover "hidden," erased,

                              21

compressed, encrypted, or password-protected data.  As a result,
a controlled environment, such as a law enforcement laboratory
or similar facility, is essential to conducting a complete and
accurate analysis of data stored on digital devices.

       c.   While, a single megabyte of storage space is the
equivalent of 500 double-spaced pages of text.  A single
gigabyte of storage space, or 1,000 megabytes, is the equivalent
of 500,000 double-spaced pages of text.

       d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.[3]
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or

_____

   [3] These statements do not generally apply to data stored in
volatile memory such as random-access memory, or "RAM," which
data is, generally speaking, deleted once a device is turned
off.

recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

      e.   Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has

been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence
in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

         f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the

24

absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

      g.  Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by
using encryption, which means that a password or device, such as
a "dongle" or "keycard," is necessary to decrypt the data into
readable form.  In addition, digital device users can conceal
data within another seemingly unrelated and innocuous file in a
process called "steganography."  For example, by using
steganography a digital device user can conceal text in an image
file that cannot be viewed when the image file is opened.
Digital devices may also contain "booby traps" that destroy or
alter data if certain procedures are not scrupulously followed.
A substantial amount of time is necessary to extract and sort
through data that is concealed, encrypted, or subject to booby
traps, to determine whether it is evidence, contraband or
instrumentalities of a crime.  In addition, decryption of
devices and data stored thereon is a constantly evolving field,
and law enforcement agencies continuously develop or acquire new
methods of decryption, even for devices or data that cannot
currently be decrypted.

44.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII. **CONCLUSION**

45.  For all the reasons described above, there is probable cause to believe that KIM, BACK, and BONG JUN KIM committed a violation of 16 U.S.C. §§ 3372(a)(2)(B), (a)(4) (illegally attempting to export plants to a foreign country in violation of a state law or regulation).  Based on the foregoing facts, there also is probable cause for the issuance of arrest warrants for KIM, BACK, and BONG JUN KIM.  There also is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses described above, will be found on the SUBJECT DEVICES described in Attachment A.

LAURA CHEE, Special Agent
United States Fish and
Wildlife Service

Subscribed to and sworn before me
this ___ day of December 2018.

HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE